IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

**SHIRLEY CORBITT**                                                                                    **PLAINTIFF**

VS.                         Civil No. 2:18-cv-02119-PKH-MEF

**ANDREW M. SAUL, Commissioner,**
**Social Security Administration**                                                              **DEFENDANT**

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

#### I.     Procedural Background

Plaintiff, Shirley Corbitt, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying her claim for supplemental security income ("SSI") under Title XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. § 1382.  In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  42 U.S.C. § 405(g).

Plaintiff filed her application for SSI on May 12, 2016, due to depression, anxiety, lymphedema, social anxiety, and melanoma.  (ECF No. 11, pp. 16, 192, 210).  Plaintiff alleged an onset date of January 1, 2007.  (*Id*.).  Her claim was denied initially on October 26, 2015, and upon reconsideration on January 14, 2016.  (*Id*., pp. 16, 123-126, 135-37).  An administrative hearing was held on April 21, 2017, in Fort Smith, Arkansas, before the Hon. Clifford Shilling, Administrative Law Judge ("ALJ").  (*Id*., pp. 51-89).  Plaintiff was present and represented by counsel, Michael Hamby, at the hearing.  (*Id.*).  Kola Brown, a vocational expert, also testified at the hearing.  (*Id*.).

By written decision dated September 28, 2017, the ALJ found Plaintiff's malignant

1

neoplasm of the skin, lymphedema, affective disorders, organic mental disorders, anxiety disorders, and substance addiction disorders to be severe, but that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments. (*Id*., pp. 18-20). The ALJ found that Plaintiff retained the residual functional capacity ("RFC") to:

> [P]erform light work as defined in 20 CFR 416.967(b) except as follows: The claimant can lift and/or carry twenty pounds occasionally and ten pounds frequently and push and/or pull within the limits of lifting and carrying. She can stand and/or walk for six hours in an eight-hour workday and sit for a total of six hours in an eight-hour workday. The claimant can perform work where interpersonal contact is incidental to the work performed, the complexity of tasks is learned and performed by rote with few variables, and little judgment is required. Supervision is simple, direct, and concrete. The claimant needs a hand-held device for prolonged ambulation. (*Id*., p. 20).

With the assistance of a vocational expert ("VE"), the ALJ then determined that while Plaintiff had no past relevant work, she could perform the requirements of the representative occupations of: Poultry Dresser (DOT No. 525.687-070), 10,000 jobs in the national economy; Router (DOT No. 222.587-038), with 50,000 jobs in the national economy; or, Merchandise Marker (DOT No. 209.587-034), with 200,000 jobs in the national economy. (*Id*., p. 24-25). The ALJ found Plaintiff had not been disabled under the definition of the Act from May 12, 2016, through the date of his decision. (*Id*., p. 25).

On June 20, 2018, the Appeals Council denied Plaintiff's request for review. (*Id*., pp. 6-10). Plaintiff then filed this action on July 16, 2018. (ECF No. 1). This matter is before the undersigned for report and recommendation. Both parties have filed appeal briefs. (ECF Nos. 14, 15). The case is ready for decision.

## II. Relevant Evidence

The undersigned has conducted a thorough review of the entire record in this case. The complete sets of facts and arguments are presented in the parties' briefs and are repeated here

only to the extent necessary.

At the administrative hearing held on April 21, 2017, Plaintiff testified that she made it to the ninth grade in school, and later earned a GED. (ECF No. 11, pp. 56). In addition to the impairments listed in her application, she also had to have a hysterectomy for a tumor the size of a softball, a complete thyroidectomy, and knee surgery which caused the lymphedema. (*Id.,* p. 57). She experienced daily pain of about a seven out of ten in her thigh, knees, shoulders, and hands. (*Id.*, pp. 57-58). She took hydrocodone for her pain on an as needed basis, which would be about three times daily. (*Id.*). The hydrocodone helped her pain but did not help the burning sensation, and there was nothing else that relieved her pain. (*Id.*). She used a cane six out of seven days if she left the house, and the cane had been prescribed by a doctor. (*Id.*, pp. 59-60).

Plaintiff testified she made F's and D's in school, that her difficulty learning was part of why she dropped out of school, and that it took a couple of times trying to complete her GED. (*Id.*, p. 60). Her last work had been as a personal care aide. She said that job ended in November 2006 when she had some medical testing done and they started finding cancer in her body. (*Id.*, pp. 62-63).

Plaintiff had an oophorectomy previously in 2002, but they found a tumor the size of a softball which required a complete hysterectomy and the implantation of a bladder sleeve. (*Id.*, p. 63). She was experiencing difficulties with the bladder sleeve and was in the process of getting a corrective surgery scheduled; she was experiencing daily incontinence. (*Id.*, p. 64). Her doctors discovered she also had thyroid cancer, and in the course of performing a complete thyroidectomy damaged her parathyroid. (*Id.*, p. 65). Plaintiff testified her lingering effects included vitamin D and calcium deficiencies, and her thyroid medication had to be closely managed or she would start losing weight, feeling sick, and losing her hair. (*Id.*).

Plaintiff also had malignant melanoma on her right leg, which had required the removal of lymph nodes near her groin, and this caused her lymphedema. (*Id*., pp. 65-66). The lymphedema was constant in her right upper leg, but it would move down her leg and up into her arm and fingers. (*Id*.). The lymphedema was severe enough to spread into her fingers on average a couple times per month, and when she had flare-ups, she would have to stay in bed propped up, take hot baths to soak her leg, take her water pills, and wear prescription support hose. (*Id*., pp. 66-67, 68). Plaintiff had swelling in her leg and foot at least a couple days each week, but it was very variable and unpredictable, and it seemed to be worsened by sitting too long, standing too long, or riding in a vehicle. (*Id*., p. 67).

Plaintiff described having arthritis in her left shoulder and arm, as well as pins in her left elbow, but that the arthritis on her right side was more painful. (*Id*., 68-69). She said her ability to use her left arm was limited, for example, she would struggle to pick up and pour a gallon of milk and would be shaky if she attempted to do so. (*Id*., p. 69).

She also said she had a torn meniscus in her left knee, which was painful like her arthritis, and she was seeking treatment but had not yet had any injections or surgeries. (*Id*., pp. 71-72). Plaintiff testified that she also had chronic back pain, but she was focused on trying to improve her knee at that time. (*Id*., p. 73). Plaintiff reported difficulty walking and a history of falling at least once a month; she said she had fallen twice that month and got hurt each time. (*Id*., pp. 78-79).

She claimed she could walk for only five to ten minutes before having to stop and catch her breath. (*Id*., p. 76). She reported going up stairs was very laborious, even when using her cane, so she avoided them. (*Id*.). Sitting down was also difficult due to her lymphedema and required her to elevate her leg, and she did not drive because it hurt her foot and leg. (*Id*., pp. 76-

77, 78). She was able to use a riding lawn mower to mow her lawn at times, but as often other people would have to do it for her, and she was unable to do any other kind of yardwork. (*Id.*, pp. 80-81).

Plaintiff related that she had a long history of psychiatric treatment and had tried many medications. (*Id.*, pp. 60-61). She had been on Mirtazapine but had been taken off it recently, and this had caused withdrawal symptoms. (*Id.*, p. 60). Even with her medications, she was perhaps not as depressed, but she couldn't focus or pay attention, and she was having tremors every morning. (*Id.* p. 61). Earlier that year, she said she had been in bed for 17 out of 30 days due to a combination of lymphedema and depression. (*Id.*). She reportedly had so much difficulty with focus that she could not even watch a television show or watch her grandchildren alone because she would lose track of them. (*Id.*, pp. 61-62). Her mental impairments made it difficult for her to be around people, particularly people she didn't know. (*Id.*, pp. 70-71). She gave the example of trying to go shopping, and it would feel like there were hundreds of people and she would have to leave her basket and just go home. (*Id.*). She described having difficulties doing things like showering or remembering to take her medications. (*Id.*, p. 79).

Medical evidence of record shows:

On February 12, 2016, Sumanth Bulgari, M.D., noted Plaintiff's urine continued to show blood and she needed to be referred to urology. (*Id.*, p. 309). Plaintiff's vitamin D levels were within limits, but her thyroid function was abnormal, and her dose of thyroid medication needed to be decreased and her thyroid function re-tested in six to eight weeks. (*Id.*).

On March 17, 2016, Plaintiff had a cystoscopy and pyelogram retrograde under anesthesia. (*Id.*, pp. 306, 308-09). Joseph Padalino, M.D., performed the procedure and had no abnormal findings. (*Id.*, pp. 308-09).

On June 15, 2016, Plaintiff saw Rachel R. Fiori, M.D., for anxiety and insomnia.  (*Id*., pp. 294-97).  Plaintiff reported she had quit her medication a few years ago but was experiencing worsening anxiety with symptoms of trouble sleeping, too much energy, restlessness, inability to manage her thoughts, tunnel vision, difficulty concentrating, lack of appetite, and nervousness around strangers.  (*Id*., p. 294).  Plaintiff reported she had suffered from anxiety since a young age with treatment for about ten years, and one hospitalization at the age of 14 after overdosing on Tylenol attempting to get her family's attention, but no current depression or suicidal ideation.  (*Id*.).  Dr. Fiori diagnosed Plaintiff with generalized anxiety disorder and insomnia and advised Plaintiff to continue with Clonazepam for her mood and start mirtazapine for both anxiety and insomnia.  (*Id*., p. 296).

On the same date, Plaintiff saw Dr. Bulgari for a follow-up.  (*Id*., pp. 297-304).  Dr. Bulgari reviewed Plaintiff's thyroidectomy of August 10, 2011 and noted that while cancer was suspected the final biopsy did not show any evidence of malignancy.  (*Id*., p. 298).  Dr. Bulgari noted Plaintiff had been started back on thyroid supplementation and her labs showed a normal thyroid stimulating hormone (TSH) level.  (*Id*.).  Dr. Bulgari documented Plaintiff's report of previous probably cancerous lesion on her cervix, which resulted in a hysterectomy and right oophorectomy with a later left oophorectomy after a tumor was found on that ovary.  (*Id*, p. 298).  Dr. Bulgari noted Plaintiff's previous diagnosis of melanoma of the leg, and the biopsy of a subsequent lesion on her leg which was found to be benign, as well as the biopsy of a lesion over her upper abdomen with findings consistent with compound melanocytic nevus.  (*Id*.).  Dr. Bulgari diagnosed Plaintiff with right upper quadrant pain; dyspepsia; acute diarrhea; rib pain on right side; melanoma of lower leg, right; nevus of left eye; post-surgical hypothyroidism; hematuria; postsurgical menopause; vitamin D deficiency; generalized anxiety disorder (GAD);

and, insomnia. (*Id.*, pp. 302-03).

On August 15, 2016, Plaintiff saw a psychologist, Patricia Walz, Ph.D., for a mental diagnostic evaluation. (*Id.*, pp. 482-86). Dr. Walz noted Plaintiff's speech was rapid and rambling in nature, and her thought process was circumstantial and required continual interruption as Plaintiff gave irrelevant details and lost the topic. (*Id.*, p. 484). Dr. Walz opined Plaintiff's intellectual functioning was likely in the low average range. (*Id.*, p. 485). Dr. Walz noted Plaintiff's reports of difficulty concentrating and racing thoughts since childhood and provided a provisional diagnosis of ADHD. (*Id.*). Dr. Walz diagnosed Plaintiff with a panic disorder, and she opined it was fairly well managed with medication and isolative behavior. (*Id.*). Dr. Walz noted a history of trauma and erratic lifestyle, which she opined was probably reflective of personality disorder with borderline traits, and she also diagnosed Plaintiff with chronic depression and Opioid Use Disorder, reportedly in remission. (*Id.*). At least some limitations were noted in each area of adaptive functioning. (*Id.*, pp. 485-86). Plaintiff could drive and borrowed her friend's vehicle. She could go into town and to doctor's appointments, but she doesn't like to get to know new people and belonged to no clubs, churches or other organizations. (*Id.*, p. 486). In the areas of communication, Dr. Walz opined Plaintiff speech was clear but rambling, and her social skills would be impaired by her anxiety and rambling nature. (*Id.*). In the area of ability to maintain and sustain concentration, Dr. Walz noted Plaintiff had a history of difficulty concentrating since childhood, which was worsened by her anxiety. (*Id.*). Dr. Walz believed Plaintiff's persistence would be limited by her poor concentration and distractibility. (*Id.*). Regarding pace, Plaintiff's speed of processing was rapid and inefficient. (*Id.*).

On September 28, 2016, Plaintiff saw Dr. Fiori and reported that she felt her anxiety had

been doing better, but she had a bad panic attack two or three weeks prior when her disability application was denied. (*Id*., pp. 734-36). Plaintiff reported her Clonazepam was helpful, but she had not been sleeping well for the past three weeks; and, she had energy but was worried, indecisive, and unable to focus. (*Id*., p. 734). Dr. Fiori assessed Plaintiff's generalized anxiety disorder as improving overall, but with a decline in the last month, and her insomnia as better with mirtazapine. (*Id*., p. 735).

On October 10, 2016, Plaintiff presented to Honey R. Schumburg, P.A.-C, who was supervised by Brad R. Johnson, M.D., for an examination and evaluation of possible skin cancers. (*Id*., pp. 672-74). Dr. Johnson provided diagnoses of seborrheic keratosis, scar conditions and fibrosis of skin, personal history of malignant melanoma of skin, and other benign neoplasm of skin of trunk. (*Id*., p. 674).

On October 24, 2016, Plaintiff went to the Mercy Hospital Emergency Department after a fall, which she reported occurred four hours earlier, with complaints of pain in her left foot, ankle, and knee. (*Id*., pp. 492-93). A physical examination showed instability of the left knee with edema and ecchymosis. (*Id*., p. 494). X-rays of Plaintiff's left foot and lower leg showed no abnormalities or fractures. (*Id*., p. 495). Plaintiff was diagnosed with a strain of the left ankle and foot, and a tear of the medial meniscus of the right knee. (*Id*.).

On November 2, 2016, Plaintiff saw Edward Rhomberg, M.D. Plaintiff reportedly fell from her deck on October 24, injuring her left knee. (*Id*., p. 654). Plaintiff complained of both left knee pain and left foot pain, x-rays were taken of both regions, and Dr. Rhomberg diagnosed Plaintiff with a sprain in both her left knee and left foot, and he provided a short leg cast and advised Plaintiff to follow up with an MRI in six weeks. (*Id*., pp. 654-55).

On November 11, 2016, state agency medical consultant, Paula Lynch, M.D., evaluated

the medical evidence of record and found Plaintiff would be limited to: unskilled work where interpersonal contact was incidental to the work performed; tasks would be learned and performed by rote with few variables and little judgment required; and, any supervision would be simple, direct, and concrete. (*Id*., pp. 116-19).

On November 16, 2016, state agency medical consultant, Judith Forte, M.D., evaluated the medical evidence of record and found Plaintiff could: occasionally lift and/or carry up to 20 pounds; frequently lift and/or carry up to 10 pounds; and, she could sit, stand, and/or walk about six hours in an eight-hour workday. (*Id*., pp. 115-16). Dr. Forte opined that the medical evidence of record supported a light RFC. (*Id*., p. 116).

On November 28, 2016, Plaintiff was seen by Stephen Carney, M.D., for a one-month follow-up on her knee sprain. (*Id*., p. 657). Dr. Carney performed a physical examination and did not note any abnormalities, including edema or gait issues. (*Id*., pp. 659-60). Dr. Carney's assessment included hypothyroidism, depressive disorder, chronic anxiety, history of hypotension, polyosteoarthritis, and gastroesophageal reflux disease. (*Id*., p. 660).

Dr. Carney then wrote a letter dated December 1, 2016, stating Plaintiff was completely unable to work due to malignant melanoma of her left leg and resultant lymphedema, which he did not expect to improve to any degree that she would become able to work. (*Id*., p. 668).

On December 2, 2016, Plaintiff saw Dr. Fiori regarding insomnia. (*Id*., p. 676). Plaintiff reported that her anxiety was under fair control since the last visit, but she was having more down and depressed days, and it was worse on days when the weather was gray. (*Id*.). She reported that out of the last 30 days she had spent 17 of them in bed. (*Id*). Plaintiff reported the Klonopin was helping with her anxiety and her insomnia was somewhat better, but she wanted to discuss ADHD and felt she needed medication for attention and focus. (*Id*.). Plaintiff reported

experiencing difficulties with attention and focus all her life; that she couldn't complete tasks or even watch a TV show, and she wanted to know if there was a treatment for these issues. (*Id*.). Dr. Fiori planned to continue Plaintiff's current medication regimen and add a trial of Wellbutrin for attention and focus, but Dr. Fiori noted Plaintiff did not meet the criteria for ADHD independently and would not be a stimulant candidate at that time. (*Id*., p. 738).

On December 12, 2016, Plaintiff presented to Dr. Balguri with complaints of severe urinary urgency, daytime and nighttime incontinence, and weekly leakage of liquid stool and gas. (*Id*., p. 704-07). Dr. Balguri diagnosed Plaintiff with urinary incontinence and vaginal prolapse, and noted previous cystoscopy, pyelograms, and CT scans in March of 2016 did not show abnormalities. (*Id*.). A physical examination showed a positive Marshall Bonney test, positive cough stress test in the supine position, and mild vaginal atrophy. (*Id*., p. 706). Dr. Balguri planned to evaluate Plaintiff's bladder with urodynamics and prescribe vaginal estrogen cream, with further treatment options to be discussed at the next visit. (*Id*., p. 707).

On February 15, 2017, Plaintiff returned to Dr. Carney to discuss her depressive disorder, osteoarthritis, hypothyroidism, chronic anxiety, and malignant melanoma of the lower limb. (*Id*., pp. 683-87, 690). Dr. Carney noted no abnormalities on Plaintiff's physical exam beyond a scar on her right leg from removal of malignant melanoma in 2012. (*Id*., p. 686).

Plaintiff saw Dr. Carney again on March 17, 2017 with complaints of swelling and burning in her legs. Plaintiff requested a prescription for a cane and for compression hose. (*Id*., p. 680). Upon physical examination, Dr. Carney specifically noted no inflammatory conditions and edema. (*Id*., p. 683). However, Dr. Carney provided a diagnosis of localized edema of the lower extremity and prescribed Plaintiff a cane and compression hose. (*Id*., pp. 670, 683, 691).

On April 12, 2017, Plaintiff saw Dr. Fiori and reported she was not doing well. Her

anxiety had increased acutely since finding her brother deceased, and she was feeling guilt for not making him go to the hospital. (*Id.*, p. 739). Plaintiff reported Wellbutrin had not helped much, that she was sleeping well, but the mirtazapine was also causing weight gain which worsened her depression, and she no longer wanted to take clonazepam as the pharmacy had changed manufacturers and it was no longer as effective. (*Id.*). Dr. Fiori planned to discontinue prescriptions for clonazepam and mirtazapine and start diazepam at 10 mg twice daily and sertraline titrating to 100 mg. (*Id.*, p. 740).

On May 17, 2017, Dr. Carney filled out a physical medical source statement which he marked as covering the time period of May 17, 2017 through May 17, 2018. (*Id.*, pp. 743-44). Dr. Carney marked that plaintiff could: occasionally lift and/or carry less than ten pounds; stand for one hour per day; sit for one hour per day; would be extremely limited in her ability to push and/or pull, and noted this was due to pain and swelling in her legs; and, she could never climb, balance, stoop, kneel, crouch, or bend. (*Id.*). Dr. Carney also marked that Plaintiff would be limited in reaching, handling, fingering, and feeling, and that she would have environmental restrictions. (*Id.*, p. 744). Dr. Carney explained that extremes of temperature exacerbated the swelling and pain in Plaintiff's legs. (*Id.*). Dr. Carney also wrote that Plaintiff's chronic, worsening lymphedema in both lower extremities was exacerbated by standing and activity. (*Id.*).

On June 1, 2017, Plaintiff returned to Dr. Fiori on June 1, 2017. She reported her depression was better on the sertraline and she had more energy; but, the same difficulties with concentration and focus to complete tasks continued and she asked about Adderall. (*Id.*, p. 746). Plaintiff reported she had lost weight since stopping mirtazapine, but her insomnia was worse, requiring her to take two valiums to sleep. (*Id.*). Dr. Fiori noted Plaintiff wanted to target

11

motivation and concentration and felt that bupropion had not helped in the past. (*Id*.). Plaintiff reported that she was medically stable, with no worsening of her lymphedema, but that she was frustrated when leg pain interfered. (*Id*.). Dr. Fiori noted Plaintiff had a limping gait. (*Id*., p. 747). Dr. Fiori planned to discontinue Wellbutrin, continue diazepam and sertraline for Plaintiff's anxiety, and to prescribe valium for insomnia. (*Id*., p. 748).

On August 30, 2017, a state agency medical consultant, Abesie Kelly, Ph.D., evaluated the evidence of record and found that Plaintiff had mild difficulties in activities of daily living (ADL's); moderate difficulties in maintaining social function; and, moderate difficulties in maintaining concentration, persistence, or pace. (*Id*., pp. 96-97). Dr. Kelly evaluated Plaintiff under the listings for organic mental disorders, affective disorders, anxiety-related disorders, and substance addiction disorders. (*Id*., p. 96).

On September 5, 2017, Plaintiff saw Dr. Fiori with complaints of heightened anxiety and reported the diazepam did not help her sleep or help her with her anxiety. (*Id*., p. 749). Plaintiff was very stressed and worried about her medical health, due to severe headaches and difficulties with getting insurance to cover testing to be sure it was not cancer recurrence. (*Id*.). Plaintiff had lost weight and felt better about that, but she was still having leg pain. (*Id*.). Dr. Fiori assessed Plaintiff's anxiety as poorly controlled and planned to titrate sertraline to 150mg, and resume clonazepam for Plaintiff's insomnia. (*Id*., p. 750).

On October 16, 2017, Plaintiff saw Humdum Durrani, M.D. for a melanoma follow-up visit. (*Id*., pp. 783-87). Plaintiff reported some unexpected weight changes, appetite changes, chills, and fatigue, but that her most concerning symptom was worsening of her headaches. (*Id*., p. 783). Dr. Durrani evaluated Plaintiff's right leg and noted the biopsy of the new skin lesion showed benign nevus, with the plan being to continue to follow along with dermatology. (*Id*., p.

787). Dr. Durrani assessed Plaintiff's lymphedema as improved, and her headaches as concerning for metastatic disease considering her history of melanoma. (*Id*.). Dr. Durrani planned to order an MRI of Plaintiff's brain. (*Id*.).

### III.   Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011). We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014). If there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. § 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D). A Plaintiff must show that her disability, not simply

her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. 20 C.F.R. § 416.920(a)(4). Only if she reaches the final stage does the fact finder consider the Plaintiff's age, education, and work experience in light of her residual functional capacity. *McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982), *abrogated on other grounds by Higgins v. Apfel*, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. § 416.920(a)(4)(v).

### IV. Discussion

Plaintiff raises a single issue on appeal: whether the ALJ's RFC finding is supported by substantial evidence. (ECF No. 14, p. 2). Plaintiff argues the evidence of record reveals limitations significantly greater than those assessed by the ALJ. (*Id.*).

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 416.945(a)(1). It is defined as the individual's maximum remaining ability to do sustained work activity in an ordinary work setting "on a regular and continuing basis." 20 C.F.R. § 416.945; Social Security Ruling (SSR) 96-8p. It is assessed using all relevant evidence in the record. *Id*. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005); *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from

symptoms such as pain are also factored into the assessment. 20 C.F.R. § 416.945(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003). Nevertheless, in evaluating a claimant's RFC, an ALJ is not limited to considering medical evidence exclusively. *Cox v. Astrue*, 495 F. 3d 614, 619 (8th Cir. 2007) (citing *Lauer v. Apfel*, 245 F.3d at 704); *Dykes v. Apfel*, 223 F.3d 865, 866 (8th Cir. 2000) (per curiam) ("To the extent [claimant] is arguing that residual functional capacity may be proved only by medical evidence, we disagree."). Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012); 20 C.F.R. § 416.946(c).

Plaintiff argues the ALJ erred by failing to discuss her history of left shoulder surgery documented in a progress note dated August 10, 2010, and a lumbar MRI from January 4, 2012 revealing an L4-5 annular fisar (sic) with mild impingement upon the thecal sac. (ECF No. 14, p. 2). In his decision, the ALJ stated that all evidence of record had been duly considered, whether or not specifically referenced in the decision. (ECF No. 11, p. 23). This statement is enough to warrant a presumption that the ALJ discharged his duties as stated. *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) (administrative law judge is not required to discuss all evidence, and failure to cite specific evidence does not mean it was not considered).

Plaintiff contends the ALJ erred in giving little weight to the opinions of Dr. Fiori, who had treated Plaintiff since June 2016. (ECF No. 14, p. 2). However, the ALJ did not explicitly give weight to, nor did he explicitly discount, the opinions of Dr. Fiori. (ECF No. 11., pp. 21-

15

23).  Plaintiff further argues that even Dr.Walz's findings, whose opinion was afforded great weight by the ALJ, were not discussed to any extent by the ALJ.  (ECF No. 14, p. 3).  However, the ALJ did discuss Plaintiff's reports to Dr. Fiori and Dr. Walz, as well as the treatment and diagnoses provided by each.  (ECF No. 11, pp. 22-23).  The ALJ specifically found Dr. Walz did not suggest the findings were indictive of inability to perform ordinary work activity.  (*Id*., p. 22).

A review of Dr. Walz's assessment reveals that she noted at least some limitations in each area of adaptive functioning.  (*Id*., pp. 485-86).  In day to day adaptive functioning, Dr. Walz noted Plaintiff could drive and go into town and to doctor's appointments, but that she did not like to get to know new people and belonged to no clubs, churches or other organizations.  (*Id*., p. 486).  In the areas of communication, Dr. Walz noted Plaintiff's speech was clear but rambling, and her social skills would be impaired by her anxiety and rambling nature.  (*Id*.).  In the area of ability to maintain and sustain concentration, Dr. Walz noted Plaintiff had a history of difficulty concentrating since childhood, which was worsened by her anxiety.  (*Id*.).  Dr. Walz opined Plaintiff's persistence would be limited by her poor concentration and distractibility.  (*Id*.).  Regarding pace, Dr. Walz opined that Plaintiff's speed of processing was rapid and inefficient.  (*Id*.).  The ALJ provided for these limitations in his RFC findings by limiting Plaintiff to work where interpersonal contact was incidental to the work performed, tasks would be learned and performed by rote with few variables and little judgment required, and any supervision would be simple, direct, and concrete.  (*Id*., p. 20).

Plaintiff argues that Dr. Carney's frequent notations that Plaintiff had a normal gait and no edema should not have been viewed critically by the ALJ as most medical reports are generated using the same information over and over with only modifications in reference to the

complaints of any particular visit. (ECF No. 14, p. 3). Plaintiff submits the ALJ should have given more weight to records from October 24, 2016, when Plaintiff was seen at Mercy Hospital after a fall and a physical examination showed edema, tenderness, and instability in her left knee. (*Id*.; ECF No. 11, p. 494). The diagnoses provided in the medical records were a strain of the left ankle and foot, and a tear of the medial meniscus of the *right* knee. (*Id*., p. 495). However, treatment records regarding the injury to her knee in October 2016 refer to her *left* knee, and Plaintiff testified her torn meniscus was in her *left* knee. (*Id*., pp. 71-72, 494-95, 654-55).

Plaintiff next argues that, as there was evidence Plaintiff had lymph nodes removed from her *left* leg and exhibited her scars at the hearing, it would only be reasonable to assume that her gait would be impaired, she would have swelling, and she certainly would be unable to stand or walk for six hours out of an eight-hour workday or sit for six hours out of an eight-hour work day. (ECF No. 14, p. 3). The treatment records and Plaintiff's testimony regarding her lymphedema, which she attributed to the surgical removal of a melanoma on her right knee and lymph node removal higher on that same leg, reference her *right* knee and leg. (ECF No. 11, pp. 66, 303, 673, 783). Based on Plaintiff's testimony and the medical records, it appears Plaintiff's brief conflated the impairments in each knee as both occurring in the left knee. The finding of edema in Plaintiff's *left* knee after a fall resulting in a torn meniscus would not act as corroborating evidence regarding chronic edema in her *right* knee, as Plaintiff asserts in her brief. (ECF No. 14, p. 3). Further, as discussed above, the Court may not reverse the ALJ's decision simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015).

Finally, Plaintiff argues the ALJ erred in not discussing the limitations opined by Dr.

Carney, and not discussing the cane and support hose he prescribed in March 2017. (ECF No. 14, p. 4). The ALJ did specifically consider Dr. Carney's treatment record, and the opinions Dr. Carney expressed both in his letter dated December 1, 2016 and the Medical Source Statement provided May 17, 2017. (ECF No. 11, pp. 21, 23). The ALJ gave Dr. Carney's opinion stated in his December 1, 2016 letter no weight, as it was a conclusory statement that Plaintiff was unable to work, which is an issue reserved to the Commissioner. (*Id*., p. 21). The ALJ gave Dr. Carney's opinions expressed in the May 17, 2017 Medical Source Statement little weight, as Dr. Carney's opinions were not consistent with his own treatment records or other credible medical evidence of record. (*Id*., p. 23). The ALJ also discussed Dr. Carney's prescriptions for both a cane and compression hose. Specifically, the ALJ noted that Dr. Carney's treatment notes from that visit did not find any edema or abnormalities in her gait, and that Dr. Carney did not reference any testing or observation of any limitations supportive of Plaintiff's requested prescriptions. (*Id*.). The Court's own review of the medical records showed Dr. Carney provided a diagnosis of edema of the lower extremity, however the physical examination specifically shows Plaintiff had normal station and gait - and no edema. (*Id*., p. 683). Notably, Dr. Carney did not list any observations during this visit supporting this diagnosis. (*Id*., pp. 680-83). To the contrary, the ALJ found that the evidence, considered as a whole, was consistent with the opinions of Dr. Paula Lynch, M.D., a state agency medical expert, who found Plaintiff remained able to perform light, unskilled work. (*Id*.).

As discussed above, the ALJ considered each of Plaintiff's impairments and examined the medical records thoroughly. (ECF No. 11, pp. 21-23). In making his RFC determination, the ALJ considered Plaintiff's testimony and other reports of her symptoms, treatment records, and medical opinions from treating physicians, a non-examining medical consultant, and a

consultative examiner. (*Id*.).

An ALJ may decide within a "zone of choice," and reversal is unwarranted simply because some evidence might support a different conclusion. *Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2009). Here, the ALJ's RFC determination falls within the zone of choice and is supported by the medical and other evidence of record.

## V. Conclusion

For the reasons and upon the authorities discussed above, it is recommended that the ALJ's decision be affirmed and the Plaintiff's Complaint (ECF No. 1) be DISMISSED WITH PREJUDICE.

**The parties have fourteen (14) days from receipt of this report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. We remind the parties that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 8th day of July 2019.

/s/ Mark E. Ford
HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE